NORDEN et al. v. DUKE.

(Supreme Court, Appellate Division, First Department. December 11, 1908.)

1. APPEAL AND ERROR (§ 1003*)—REVIEW—FINDINGS—CONCLUSIVENESS.
   A finding on an issue properly submitted to a jury will not be disturbed as against the evidence or the weight thereof.
   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3938–3943; Dec. Dig. § 1003.*]

2. BROKERS (§ 72*)—TRANSACTIONS IN COTTON—PRINCIPAL'S LIABILITY.
   Defendant in a settlement of cotton transactions is not liable to his brokers for a loss represented by the difference between the market price when he directed them to buy and the higher price at which they bought.
   [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 57; Dec. Dig. § 72.*]

3. TRIAL (§ 194*)—INSTRUCTIONS—INVASION OF PROVINCE OF JURY.
   In an action by brokers to recover from their principal the amount of the difference between the price at which cotton was sold and the higher price at which it was bought, it was improper to direct the jury to disregard testimony of the broker's representative tending to show that, pursuant to the broker's direction, he bought at a price higher than the market when the brokers were directed to buy; the force and effect of the testimony being for the jury.
   [Ed. Note.—For other cases, see Trial, Dec. Dig. § 194.*]

4. APPEAL AND ERROR (§ 1178*)—REVERSAL—NEW TRIAL—WHEN IMPROPER.
   On reversal of a judgment for money, the case should not be remanded for a new trial on the amount of the verdict, if it can be avoided, where two juries have determined the main issue in plaintiff's favor.
   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4613–4615; Dec. Dig. § 1178.*]

Appeal from Trial Term, New York County.

Action by Hermann Norden and another against Brodie L. Duke. From a judgment for plaintiffs, and from an order denying a new trial, defendant appeals. Reversed and new trial ordered, unless plaintiffs stipulate to reduce verdict, in which event affirmed.

See, also, 99 N. Y. Supp. 30.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and HOUGHTON, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Max D. Steuer (D. L. Poddell, of counsel), for appellant.

Blandy, Mooney & Shipman (Edmund L. Mooney and Frederick A. Card, on the brief), for respondents.

CLARKE, J. This action was brought by plaintiffs, conducting business as brokers in the city of New York, under the firm name of A. Norden & Co., to recover an alleged balance of account claimed to be owing by the defendant as a result of certain transactions in the purchase and sale of cotton which they claimed to have conducted for him. The case was before this court on an appeal from an order vacating a warrant of attachment, which order was reversed (106 App. Div. 514, 94 N. Y. Supp. 878); on appeal from a judgment entered upon a dismissal of the complaint upon the trial, which judgment was reversed and a new trial granted (113 App. Div. 99, 99 N. Y. Supp. 30); and from a judgment entered upon a verdict in favor of the plaintiffs which was reversed and a new trial granted for an error upon the trial (120 App. Div. 1, 104 N. Y. Supp. 854).

The facts are sufficiently stated upon the former appeal. The transactions out of which this suit grew were conducted by one Bramham, an employé of the defendant, Duke, who resided in Durham, N. C. The main question litigated was that of agency. On the motion to vacate the attachment, this court said:

"Facts are disclosed in the proof upon which the attachment was granted from which a jury would be authorized to find that Bramham did have authority to transact the defendant's business and to give the order in question." 106 App. Div. 514, 94 N. Y. Supp. 878.

On reversing the judgment of dismissal we said:

"We think the facts thus proven by the plaintiffs establish prima facie authority on the part of Bramham to deal with the plaintiffs in defendant's name." 113 App. Div. 99, 99 N. Y. Supp. 30.

On the appeal from the judgment in plaintiffs' favor we said:

"Upon the last trial the plaintiffs presented practically the same evidence, tending to show that the defendant authorized the transactions by general authority conferred upon Bramham. The defendant testified in his own behalf, and Bramham was examined in his behalf by commission. Their evidence does not as matter of law at least overcome the prima facie case presented by plaintiffs, and the question as to whether the defendant was liable upon the ground that Bramham was his authorized agent was a question of fact which has been determined by the jury in favor of the plaintiffs. We do not regard their verdict on that question as against the weight of evidence, but are of the opinion that there must be a new trial for errors in the charge." 120 App. Div. 1, 104 N. Y. Supp. 854.

Upon this trial Bramham was called as a witness and examined in open court. We have carefully examined the record, and are of the opinion that a pure question of fact upon the question of agency was presented for the determination of the jury. The jury having resolved that question in favor of the plaintiffs, we cannot say that their verdict was against the evidence or the weight thereof.

Regarding the controversy as to the liability of the defendant to the plaintiffs as settled by the verdict, a serious question is presented upon this record as to the amount of the recovery. The transactions were

conducted by telegraph on the 22d of December, 1903. Defendant telegraphed, "Sell 2,000 March 96," which meant an order to his brokers to sell 2,000 bales of cotton to be delivered in March at 12.96 cents per pound. The plaintiffs wired back, "Sold 2,000 March 96." Shortly thereafter they wired defendant, "Please remit $2,000," to which defendant answered, "What do you think of position. Don't care to protect March"—to which they answered, "Bulls' buying wildly. Confident as ever. No faith in it ourselves." And shortly thereafter, "Please make remittance $4,000 instead of 2,000. Answer" —to which they received the reply, "You were advised did not desire to protect trade." Mr. Norden testified: That they bought 2,000 bales of cotton for defendant's account immediately after the receipt of the telegram that he did not care to protect the trade, which, in conjunction with the other telegrams, was considered as an order to close out his cotton—to buy him in. That the time this telegram was received was 2:42. "I would say that we bought that cotton at 2:43 or 2:44, within a few minutes after that, maybe five or ten minutes." That the cotton was bought through another broker in Norden's presence. That he stood right behind this broker and saw him doing it. That Mr. Allen bought the cotton, 500 bales at 13.40 and 1,500 bales at 13.44. That the loss on the transaction, including brokerage, was $4,900, to which was credited $400 gain on a previous transaction, leaving the amount due $4,500.

Mr. Allen was called as a witness by the plaintiff, and testified: That the order which he received to buy was a stop order at 40, and that he could not and did not buy until somebody else had sold at 40, meaning by that 13.40 cents a pound.

"He gave me a stop order. That means that, as soon as the market sells at 40 for March, I have got to buy these 2,000 bales, and, if I cannot get them at 40, I have got to buy them at the market. That is a stop order. * * * The March I bought on the stop order. While I had the stop order, as a matter of fact I bought at the market. I had to. There isn't anything to indicate what my stop was on that. But I recall it to my mind distinctly because I have been up here three or four times, and it has come back to me, the execution of that one order. Well, what brings it more to my mind than the other matters would be this order, for instance, was to be 2,000 March, stop at 40. And it was one of the days when we had a wild market. * * * The order was not executed by me immediately, without regard to the stop. No; I could not execute it until the market had touched the stop order price. I could not execute that order until somebody else had traded in March at 40, and, as soon as that happened, I had to fill the stop order. That is the custom in all markets of that kind. The broker is not justified in filling a stop order until it touches the price at which the stop is at."

Under cross-examination he testified:

"If this stock at the time I got that order was selling at the Exchange at 13.07, I certainly could not buy that stock. I had to wait until the stock went to 13.40 before I could buy it. If it didn't go to 13.40 on that day, I wouldn't have bought it at all."

This evidence was disconcerting to the plaintiffs, and later in the case Allen was recalled in an attempt to get rid of it. He said:

"I have been requested by Mr. Norden to turn over in my mind the subject of the execution of the order which I testified to the other day and

I have turned the matter over in my mind. * * * I have a dim recollection from looking over my book and the business that I did that day, which was very large, that this was a stop order. I am not positive about it. I recall making the trade—that is, buying the cotton—but I am not positive about the stop order. But that is my recollection. I judge a good deal from the trades entered in my book I was doing a large business that day for a whole lot of people, and especially for Mr. Norden, and that is what gives me the impression that it was a stop order."

Being cross-examined he said:

" * * * I realize that I was the first person on that day on the witness stand to use the works 'stop order,' and that it was not Mr. Mooney that first used them. * * * I had in mind a stop order because I was speaking of it. I had spoken of it, yes; and the stop order I had in mind at that time, 13.40, was the stop order I executed for 2,000 bales for Mr. Norden."

Plaintiffs' counsel again examined:

"Now, whether it was a stop order or whether it was not a stop order makes no difference in answer to the question. The question is, How instantly did you execute whatever order you got? A. I executed that order immediately."

Under cross-examination he was asked:

"Do you mean to say now that you remember that when the order was passed to you that you immediately executed it? A. I execute every order that I get immediately, unless I have to wait on a stop order. * * * If it was a stop order given to me earlier in the day, I had to wait, but, if it was a stop order given to me when the market was within, for instance, two points of the stop order price, I would have to act immediately.

"And you do not recall the circumstances as to when this order was given to you? A. I recall it to this extent. I am not positive about it, but I recall to this extent that I got the order late in the day, and not early in the day. That is all."

His last statement was:

"Did you remember, then, that you had to execute it immediately? A. I answered that question, sir, in connection with the fact that in my mind it was a stop order. That is the way these orders are executed."

The importance of this testimony lies in the fact that upon that day the market was fluctuating; that between 2:41 p. m. and 3 p. m., when the market closed, the price varied between 13.33 and 13.47. It is conceded that it was the duty of the plaintiffs to buy at the market. If, instead of buying at the market, they had given an order to buy at a fixed price above the market, and the purchase had been made in accordance with that order after waiting for the action for the cotton to reach the fixed price, of course, the defendant would not be responsible for such enhanced loss.

In its charge the learned court said:

"If you find that the plaintiffs are entitled to a verdict, then they are entitled to recover the amount of the difference between the goods sold and the amount of the goods that were purchased, crediting the defendant with the amount of $400 which the plaintiffs claim to hold for the benefit of the defendant upon a prior transaction, and the plaintiffs say that on a proper calculation of that amount is the sum of $4,500. If you find that the plaintiffs are entitled to recover that amount, then you ought to find also the amount of interest which has been calculated at $1,058.25."

In other words, it charged that, if plaintiffs were entitled to a verdict, the amount thereof was $4,500 and interest. Counsel for defendant said:

"Do I understand your honor charges this jury that if Mr. Allen executed a stop order that nevertheless the jury must calculate the damage according to the telegrams of December 22d?

"The Court: That as between the plaintiffs and the defendant, the evidence of Mr. Allen cannot be considered.

"Counsel for Defendant: That is what your honor instructs the jury?

"The Court: That is the effect of my instruction.

"Counsel for Defendant: And to that we respectfully except. We ask your honor to charge the jury that Allen was employed by the plaintiffs in this action; that the act of Allen in executing the order is binding upon the plaintiffs in this case, and, if Allen only executed a stop order on December 22, 1903, then the instructions of the defendant, even if Bramham's act was binding upon the defendant, ha 'e never been carried out and the plaintiffs cannot recover in this case.

"The Court: I refuse to charge in the language requested. (Exception.)

"Counsel for Defendant: We ask your honor to charge the jury that Allen was employed by the plaintiffs in this c se, and if on the 22d of December Allen failed to make the purchase at the market prevailing rates at the time when the dispatch from Bramham, even if binding upon the defendant, was received by the plaintiffs, and Allen in fact did execute a stop order, then the plaintiffs cannot recover the sum of $4,500, but that they would be limited in their right to recover to a sum which would be the calculation of the difference between what the plaintiffs paid for the stock when they purchased it and what they received for the stock when they sold it, if the purchase had been made at the rate prevailing on the exchange at the time when the telegram was received by the plaintiffs.

"The Court: That I charge.

"Counsel for Defendant: Then I understand your honor to charge the jury that the question of stop order should not be considered by them at all?

"The Court: I have stated that already. I have charged what you have requested me. Go ahead with your requests.

"Counsel for Defendant: That is clearly an inconsistent charge.

"The Court: I don't think so.

"Counsel for Defendant: I ask your honor to instruct the jury that if they find that Allen executed a stop order, and not a market order, that Allen's act is binding upon the plaintiffs, and they cannot recover the sum of $4,500 in this case.

"The Court: I refuse to charge in the language requested, and will not charge any further than I have already charged.

"Counsel for Defendant: We except."

The effect of this was that the testimony of Allen, plaintiffs' witness, who executed the order, was in its entirety taken from the consideration of the jury, and they were instructed in effect that there was no controversy for them to determine as to the amount of the damages, but that, if plaintiffs were entitled to recover, they were entitled to recover $4,500. Allen's testimony had not been stricken from the case. It was material to the issue, and we are unable to perceive under what possible theory the court was authorized to instruct the jury to disregard it. Being in the case, it was unquestionably for the consideration of the jury, and it was for them to determine its force and effect.

Norden testified that he received the telegram at 2:42. At 2:43 the cotton was selling at 13.35. At 2:48 it was selling at 13.34 and at 13.33; at 2:51 at 13.38. It was not until 2:55 that it got to 13.40, at which price 500 bales were bought and at 2:56 it reached 13.44, at

which price 1500 bales were bought. The telegram was received upon the floor of the Exchange, and the plaintiff Norden stood immediately behind his agent, Allen, who executed the purchase. If it had been made, as he testified, immediately, or within five minutes, the Exchange figures show the price varying between 13.33 and 13.36 with a number at 13.35. Taking the average at 13.35 cents a pound for a bale of 500 pounds, it would amount to $66.75 a bale, which for 2,000 bales would amount to $133,500. The sale at 12.96 a pound for 2,000 bales amounted to $129,600, which would show a loss of $3,900, to which should be added the brokerage of $200, making $4,100, from which should be subtracted the credit of $400 allowed, making a total of $3,700.

We do not think that this case should be sent back for a new trial upon this question of amount of the verdict, inasmuch as two juries have determined the main issue in favor of the plaintiffs, if it can be avoided.

The judgment and order appealed from should be reversed, and a new trial ordered, with costs to appellant to abide event, unless the plaintiffs stipulate to reduce the verdict to $3,700 and interest, and, if so stipulated, judgment and order affirmed, with costs to respondents. All concur.